IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

**SARAH SNYDER**,
411 Prairie View Circle
Milton, WI 53563

      Plaintiff,

v.

**NOVARES US ENGINE COMPONENTS, INC.**,
f/k/a Miniature Precision Components, Inc.
c/o Registered Agent
Vadim Yakubov
820 Wisconsin Street
Walworth, WI 53184-9516

      Defendant.

Case No.: 21-cv-314

**JURY TRIAL DEMANDED**

---

# COMPLAINT

---

NOW COMES Plaintiff, Sarah Snyder, through her attorneys, Hawks Quindel, S.C., by Nicholas E. Fairweather and Caitlin M. Madden, and Patrick O'Connor, d/b/a O'Connor Law Firm, and hereby states the following as her Complaint in the above-captioned matter:

## NATURE OF PROCEEDINGS

1. Plaintiff brings this civil action against Defendant, Novares US Engine Components, Inc., claiming sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 *et seq.*, ("Title VII"), as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000(e), *et seq.* ("PDA").

## JURSIDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343(a)(3) because it arises under the laws of the United States and an Act of Congress for the protection of civil rights. The jurisdiction of the Court is invoked specifically to secure protection and redress deprivation of rights guaranteed by federal law, which rights provide for damages, injunctive and other relief for illegal discrimination in employment.

3. Venue is proper in the Western District of Wisconsin under 28 U.S.C. §1391 and 42 U.S.C. § 2000e-5(f)(3) because Defendant operates a facility in this District and because substantial parts of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

4. Plaintiff, Sarah Snyder ("Snyder"), is an adult resident of the State of Wisconsin and resides at 411 Prairie View Circle, Milton, Wisconsin. At all relevant times, Plaintiff was/is an "employee" of Defendant as defined at 42 U.S.C. § 2000e(f).

5. Defendant, Novares US Engine Components, Inc., formerly known as Miniature Precision Components, Inc., is a Wisconsin business corporation with an address of 820 Wisconsin Street, Walworth, WI 53184, that designs and manufactures a variety of thermoplastic components, extruded tubing and assemblies for the automotive industry and other commercial industries. As relevant here, Defendant operates a plant at 2929 Venture Drive Janesville, WI 53546 ("Janesville Plant") which is where Plaintiff worked. At all relevant times, Defendant

is a "person" under 42 U.S.C. § 2000e(a), and an "employer" under 42 U.S.C. § 2000e(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Snyder filed a timely charge of sex discrimination with the Wisconsin Department of Workforce Development ("DWD") and the Federal Equal Employment Opportunities Commission ("EEOC") on July 18, 2019, within 300 days after the unlawful employment practices occurred as described herein.

7. On January 27, 2020, the Equal Rights Division ("ERD") issued an Initial Determination finding probable cause to believe that Defendant may have violated the Wisconsin Fair Employment Act, Wis. Stat. §§ 111.31 - 111.395:

   i. By discriminating against Plaintiff in the terms or conditions of employment because of pregnancy, childbirth, maternity or related medical conditions;

   ii. In terminating Plaintiff's employment because of pregnancy, childbirth, maternity or related medical conditions;

   iii. By discriminating against Plaintiff in the terms or conditions of employment because of sex; and

   iv. In terminating Plaintiff's employment because of sex.

8. On March 24, 2020, Plaintiff withdrew her complaint from the ERD. At Plaintiff's request, the ERD transferred the complaint to the EEOC for further investigation and processing.

9. On February 11, 2021, the EEOC issued Snyder a Notice of Right to Sue and this action is brought 90 days after her receipt of said Notice. A true and correct copy of the Notice of Right to Sue is attached hereto as **Exhibit A**.

## FACTUAL ALLEGATIONS

10. Plaintiff was hired as a Machine Operator by Defendant and began working on September 17, 2018.

11. Plaintiff was pregnant when she was hired by Defendant and gave birth to her child on March 17, 2019.

12. On March 13, 2019, Defendant terminated Plaintiff's employment.

13. The operator position required Plaintiff to stand at a machine or in an assembly line throughout her shift. Operator jobs require significant standing and lifting of less than twenty-five (25) pounds.

14. Plaintiff first disclosed her pregnancy to her direct supervisor, Amanda Kalas ("Kalas") on October 22, 2018, and provided Kalas a letter with her medical restrictions which included a thirty (30)-pound lift limit, and to avoid repetitive twisting, bending, or squatting.

15. After learning of Plaintiff's pregnancy, Kalas began assigning Plaintiff tasks that she knew or should have known Plaintiff could not perform under her doctor's restrictions (i.e., tasks requiring lifting more than 30 pounds, or repetitive twisting, bending, or squatting).

16. For example, Kalas assigned Plaintiff to work a press machine which required her to remove parts from a conveyor belt and transfer them to shelving units.

17. When Plaintiff told Kalas that certain assigned tasks would require her to violate her restrictions, Kalas became frustrated.

18. Kalas began threatening Plaintiff in late October 2018 with discipline, including termination, and penalizing Plaintiff under Defendant's no-fault attendance point system and/or other company policies.

19. Upon information and belief, Kalas' intention in threatening to discipline and actually disciplining Plaintiff was to cause Plaintiff to exceed her maximum allowable points under Defendant's point system, which would result in Plaintiff's termination from the company.

20. Beginning in October 2018, Kalas harassed Plaintiff about her pregnancy approximately once per week. Kalas yelled at co-workers who helped Plaintiff when she experienced pain when working.

21. After working on the presses for some time, Plaintiff complained to a line lead that she was experiencing pain. Upon information and belief, the lead told a Human Resources ("HR") representative, who discussed the issue with Kalas.

22. Kalas thereafter continued to assign Plaintiff to presses, but told Plaintiff that she did not have to place parts on the bottom two (2) shelves of the shelving units due to her restrictions.

23. Working the presses still caused Plaintiff to repetitively twist and bend, in violation of her doctor's restrictions.

24. Kalas continued to schedule Plaintiff on the presses until February 2019. Kalas also scheduled Plaintiff to work in a "Bolts and Gaskets" position which violated her restrictions by requiring her to lift more than 30 pounds and repetitively twist and bend, causing her pain.

5

25. On October 11, 2018, Plaintiff had to leave work early and go to the emergency room for a pregnancy-related medical emergency. Defendant assessed Plaintiff one (1) attendance point for leaving her shift early.

26. Kalas told Plaintiff's co-workers, including Katlynn Stavn, that Kalas did not experience pain during her pregnancies, suggesting that Plaintiff was faking or exaggerating her pain.

27. Kalas refused Plaintiff's request to go to the emergency room on two (2) occasions, including on Plaintiff's last day of employment before her discharge, March 7, 2018, when Kalas told Plaintiff, "If you leave, you know what's coming."

28. During her pregnancy, Plaintiff consumed more fluids than usual, and required more bathroom breaks than usual. Kalas penalized Plaintiff for being in the bathroom in excess of her allotted break time.

29. Plaintiff provided Defendant with a doctor's note, stressing the importance of allowing her to use the bathroom as needed during her pregnancy. Defendant agreed to accommodate this request to use the bathroom as needed during Plaintiff's pregnancy. Still, Plaintiff's supervisors made clear that Defendant viewed the restroom accommodation in a negative light.

30. In January 2019, Kalas assessed Plaintiff an attendance point for being in the restroom past her break period.

31. Kalas did not discipline other employees, including those who did not have an approved exemption for bathroom breaks, for being in the bathroom outside of their break period.

32. Kalas refused to remove the point from Plaintiff's attendance record.

33. Kalas then scheduled Plaintiff to work in a spot located farthest from the restroom.

34. Plaintiff provided Defendant doctor's notes for some of her absences, but Defendant did not adjust her disciplinary record when she did.

35. Other employees supervised by Kalas who were not pregnant, including Brandon, Trevor, Jenny, and Melanie, also missed work, were tardy, and/or left work early, but were not subject to discipline.

36. In January 2019, Plaintiff advised Defendant that she had developed pregnancy-related sciatica, which was made worse by standing for long periods of time.

37. Plaintiff provided Defendant's HR Generalist Julie Lawrence ("Lawrence") a doctor's note dated January 31, 2019, requesting that for one half-hour per every two hours, Defendant allow her to work at a machine that she could operate while sitting down.

38. Lawrence denied Plaintiff's request for an accommodation to sit while working because of her pregnancy-related sciatica. Lawrence indicated to Plaintiff that she spent too much time away from the line and expressed concern about Plaintiff's potential absences due to her pregnancy.

39. Lawrence added that relocating Plaintiff to a sitting position would force her potential new co-coworkers to "pick up the slack," caused by her pregnancy-related absences, suggesting that Plaintiff's pregnancy lowered workplace morale.

40. At the same time, Defendant granted similar requests to sit to two (2) similarly situated male employees who were temporarily disabled.

41. Defendant allowed Trevor to work at a sitting machine for his entire shift due to a back injury that occurred at work.

42. Defendant allowed Brandon to sit for half of his shift due to an ankle injury that occurred at work.

43. When Plaintiff pointed out the difference in treatment, Lawrence told her that Defendant does not accommodate pregnant women in the same way that it accommodates workers on worker's compensation.

44. Defendant required Plaintiff to produce a new doctor's note without the standing restriction before it allowed her to come back to work.

45. Plaintiff provided Defendant a doctor's note dated February 14, 2019, which reduced her to part-time work.

46. Lawrence directly encouraged Plaintiff to quit her job on several occasions as she neared her delivery date.

47. In February 2019, Defendant recommended to Plaintiff that she should contact their short-term disability provider because her absences became more frequent.

48. Plaintiff applied and was approved for two (2) weeks of intermittent short-term disability for her pregnancy and related conditions from February 2019 to May 2019.

49. Defendant was required to keep Plaintiff's job open in the same way that it would for any other individual using short-term disability benefits.

50. In February, Plaintiff advised HR Representative Ellise Seever ("Seever") that she had been approved for short-term disability. Seever willfully misrepresented to Plaintiff that, even though Plaintiff obtained short-term disability status, Defendant did not have to keep Plaintiff's job open during her pregnancy because she did not qualify for leave under the federal Family and Medical Leave Act ("FMLA") and Wisconsin FMLA.

51. On March 7, 2019, employees of Defendant found Plaintiff crying in the restroom. Plaintiff told an attending custodian that she believed she was having contractions and wanted to go to the hospital but was afraid that if she did, Defendant would terminate her because she had already accrued the maximum number of points under the point system and another absence could cause her termination.

52. Lawrence learned that Plaintiff was in the bathroom and went in to speak with her. Lawrence told Plaintiff that she "should just quit," adding that by "being in pain, going to the bathroom, [she] was making [her] co-workers pick up the slack." Lawrence also told Plaintiff that her "baby was probably in pain."

53. Plaintiff left work immediately because of her encounter with Lawrence.

54. Under Defendant's policy, employees are to be assessed a half (1/2) point for leaving a shift early.

55. But Defendant assessed Plaintiff a full (1) point for leaving work early on March 7, 2019.

56. Kalas erroneously assessed a full (1) point against Plaintiff in October 2018, which was counted towards Plaintiff's March 2019 firing. Plaintiff previously apprised Kalas of this error, telling Kalas that she should only have been assessed a half (1/2) point. However, Defendant refused to correct its error.

57. Defendant allowed similarly situated non-pregnant employees to leave work early for medical emergencies without penalty under the attendance policy.

58. On March 12, 2019, Plaintiff provided Seever with a doctor's note excusing Plaintiff from work between March 11, 2019, to April 27, 2019, for the birth of her child and maternity leave. Seever told Plaintiff that Defendant would welcome her back as soon as she was "ready to return to work" and that there would most likely be open positions at that time.

59. Defendant's short-term disability leave policy, provided by Lincoln Financial Group ("Lincoln"), states that eligible employees may take up to a maximum of twenty-six (26) weeks of short-term disability leave. Under the policy, Defendant must hold the affected employee's job open during his or her short-term disability leave period and allow him or her to return to work at the end of the leave period.

60. Plaintiff applied for short-term disability benefits under Defendant's plan. In February, Lincoln provisionally approved Plaintiff's application for short-term disability leave benefits. Lincoln advised Plaintiff that her benefits would go into effect when her doctor took her off of work completely.

61. Based on Plaintiff's doctor's note taking her off of work completely, Lincoln officially approved Plaintiff for short-term disability leave effective March 13, 2019 to April 27, 2019, and later, backdated her approved leave start date to March 11, 2019.

62. Defendant terminated Plaintiff's employment on March 13, 2019.

63. When Defendant terminated Plaintiff's employment, Defendant knew that Plaintiff had been approved for short-term disability for her maternity leave.

64. Defendant has held open jobs for other temporarily disabled individuals on short-term disability leave.

65. Defendant sent Plaintiff a letter dated March 15, 2019, which stated that Plaintiff may reapply "when [her] doctor releases [her] to full duty."

66. At all relevant times, Plaintiff performed her job duties satisfactorily and in accordance with Defendant's legitimate expectations.

67. Because Defendant holds open jobs for employees on sick or disability leave for other reasons, it was required to hold Plaintiff's job open on the same basis.

### FIRST CAUSE OF ACTION:
### VIOLATION OF PLAINTIFF'S RIGHTS AS GUARANTEED BY
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

68. Snyder realleges and reincorporates the allegations contained in the preceding paragraphs as though set forth herein in full.

69. Snyder is a member of a protected class, female.

70. Snyder was qualified for her position as a machine operator.

71. Defendant terminated Snyder's employment on March 13, 2019.

72. Similarly situated male employees and employees who were not pregnant, including Brandon, Trevor, Jenny, and Melanie, were treated more favorably than Plaintiff by Defendant.

73. Defendant violated Plaintiff's right to be free from discrimination in the terms and conditions of her employment on the basis of her sex as guaranteed by Title VII of the Civil Rights Act of 1964, when she was unlawfully terminated because of her pregnancy.

74. Defendant failed to comply with its statutory duty to take all reasonable and necessary steps to eliminate sex discrimination from the workplace and to prevent it from occurring in the future.

75. As a direct and proximate result of Defendant's discrimination against Snyder, she has suffered and will continue to suffer damages including loss of wages and benefits, liquidated damages, front pay, pain and suffering, and emotional distress.

### SECOND CAUSE OF ACTION:
### HOSTILE WORK ENVIRONMENT IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

76. Snyder realleges and reincorporates the allegations contained in the preceding paragraphs as though set forth herein in full.

77. Title VII makes it "an unlawful employment practice for any employer…to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).

78. Defendant's agents, Kalas and Lawrence, subjected Plaintiff to unwanted verbal harassment and intimidation because of her pregnancy.

79. Defendant, through the direct actions and omissions of its agents, created, maintained, and failed to remedy an intimidating, hostile, or offensive work environment.

80. The hostile work environment was created and maintained because of Plaintiff's pregnancy.

81. Defendant's hostile actions, behaviors, and communications towards Plaintiff were severe, pervasive, and substantially interfered with her work performance.

82. Defendant's hostile actions towards Plaintiff directly contributed to and culminated in her termination.

83. Plaintiff has suffered severe mental anguish and emotional distress as a result of Defendant's hostile and discriminatory treatment and actions.

84. Defendant's hostile actions against Plaintiff were undertaken maliciously and in an intentional disregard of her rights.

85. Defendant failed to comply with its statutory duty to take all reasonable and necessary steps to eliminate sex discrimination from the workplace and to prevent it from occurring in the future.

86. Plaintiff's pregnancy, and thus, her sex, was a substantial motivating factor in Defendant's decision to terminate her employment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands Judgment against Defendant, awarding her:

A. Appropriate back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices, including, but not limited to, rightful reinstatement and/or front pay;

B. Compensation for past and future pecuniary losses resulting from the unlawful employment practices complained of in the paragraphs above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation to be determined at trial;

C. Compensation for punitive damages for Defendant's malicious and reckless conduct described above in amounts to be determined at trial;

D. Grant such further relief as the Court deems necessary and proper in the public interest; and

E. An award of reasonable attorney's fees.

## JURY DEMAND

Plaintiff respectfully requests a jury trial on all questions of fact and law raised by her complaint.

Dated this 10th day of May, 2021.

        **HAWKS QUINDEL, S.C.**
        *Attorneys for Plaintiff, Sarah Snyder*

        By: */s/ Nicholas E. Fairweather*
        Nicholas E. Fairweather, State Bar No.: 1036681
        Email: nfairweather@hq-law.com
        Caitlin M. Madden, State Bar No.: 1036681
        Email: cmadden@hq-law.com
        409 East Main Street
        Post Office Box 2155
        Madison, Wisconsin 53701-2155
        Telephone: (608) 257-0040
        Facsimile: (608) 256-0236

        **O'CONNOR LAW FIRM**
        *Attorneys for Plaintiff, Sarah Snyder*

        By: */s/ Patrick O'Connor*
        Patrick O'Connor, State Bar No.: 1094992
        Email: pmo@patoconnorlaw.com
        P.O. Box 7757
        Madison, WI 53707-7757
        Telephone: (608) 203-6349